UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| COVINGTON J. BERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:05CV02295 DJS (AGF) |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Covington Berry's application for

disability insurance benefits under title II of the Social Security Act, 42 U.S.C. §§ 401-

434, and supplemental security income (SSI) under title XVI of the Act, 42 U.S.C.

§§ 1381-1384f.  For the reasons set forth below, the Court recommends that the decision

of the Commissioner be affirmed.

Plaintiff, who was born on August 6, 1961, applied for benefits on May 5, 2003,

alleging a disability onset date of August 11, 1999, due to deafness (in one ear), carpal

tunnel syndrome, bad knees, shoulder problems, and hypertension.  Tr. at 52.  Following

a hearing on September 27, 2004, an Administrative Law Judge ("ALJ") found on

January 28, 2005, that Plaintiff was not disabled.  The Appeals Council of the Social

Security Administration declined to review the ALJ's decision.  Plaintiff has thus

exhausted all administrative remedies and the ALJ's January 28, 2005 decision stands as the final agency action.

Plaintiff argues that the ALJ erred in not fully and fairly developing the record with the result that the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") was not supported by substantial evidence. Plaintiff further argues that the ALJ erred in finding that Plaintiff was not credible and in posing a question to the vocational expert ("VE") which did not consider all of Plaintiff's impairments, such that the VE's response did not constitute substantial evidence to support the finding that Plaintiff was not disabled.

## BACKGROUND

### Work History

In a work history report dated May 4, 2003, Plaintiff reported that he had worked as a security guard from 1986 to 1989; an automobile mechanic and automobile parts salesman from 1990 to 1992; a packer/stocker from 1992 to 1993; an automobile parts salesman from 1993 to 1994; and a landscaper in 1994. Tr. at 53, 75.

### Medical Record

On June 15, 1999, Emmanuel Venkatesan, M.D., saw Plaintiff, who complained of allergies and decreased hearing in the right ear for the past two years. Plaintiff was diagnosed with hypertension, hearing loss, and serious alcoholism, and was referred to an ear, nose, and throat specialist. Tr. at 105. On June 23, 1999, Dr. Venkatesan saw Plaintiff and prescribed a refill for hypertension medication and additional medication for

anxiety. The doctor noted that Plaintiff had severe alcoholism and that rehabilitation was unsuccessful. Tr. at 102. On June 30, 1999, Dr. Venkatesan again diagnosed Plaintiff with hypertension, anxiety, and alcoholism. Tr. at 101.

On August 23, 1999, Dr. Venkatesan reported that Plaintiff had fractured his right clavicle (collarbone) in an automobile accident on August 14, 1999, but had not worn a sling or figure-eight bandage since. The doctor noted that Plaintiff was intoxicated during the appointment and was unable to converse coherently. Plaintiff was bandaged, given Tylenol III, and referred to an orthopedist. Tr. at 100. On October 22, 1999, Plaintiff complained of right arm weakness and numbness due to the August 1999 accident, and of heart palpitations since he ran out of Metoprolol (a beta blocker) three days prior. Dr. Venkatesan noted that Plaintiff had not had regular follow-up orthopedic care for his shoulder and that the right clavicle had significant deformity, with significant atrophy of the upper right extremity. Plaintiff reported a decrease in his use of alcohol. His blood pressure was noted as 150/110 and he was diagnosed with post-clavicular fracture, for which he needed rehabilitation and was advised to see an orthopedist; heart palpitations and hypertension, for which he was instructed to resume taking his beta blocker; and alcoholism, for which he was referred to social services for evaluation for a drug rehabilitation program. Tr. at 99.

On October 27, 1999, Plaintiff was seen for high blood pressure, which was recorded as 180/120. Plaintiff reported that he drank one beer a day and had used alcohol heavily in the past. He was given nitroglycerine which lowered his blood pressure to

140/110.  Plaintiff was taking Librium (an anti-anxiety medication), thiamine, folic acid, and Lopressor (a beta blocker).  He was advised not to drink any alcohol.  Tr. at 97-98.

On January 21, 2000, Plaintiff was seen by Dr. Venkatesan, who noted that Plaintiff was to have surgery on his clavicle on January 28, 2000.  Plaintiff was advised to stay away from alcohol.  Tr. at 96.  On February 24, 2000, Dr. Venkatesan saw Plaintiff for Hepatitis B.  It was noted that Plaintiff had not had surgery yet because he was intoxicated on his scheduled surgery date.  On June 9, 2000, Dr. Venkatesan saw Plaintiff for a problem with his right knee.[1]  Plaintiff's blood pressure was 160/100 and it was noted that he had not taken his hypertension medication that day.  Plaintiff had had the surgery to repair his clavicle and his right shoulder was in a sling post-surgery.  He reported that he had also injured his right knee, which was unable to bear weight.  He did not go to an emergency room for this injury, but used pain medication that he had from his shoulder surgery.  Upon examination, the right knee showed normal extension, but swelling and limited flexion.  The diagnosis was traumatic arthritis in the right knee, alcohol abuse, tobacco abuse, and hypertension for which Plaintiff had not taken medication that day.  Tr. at 92-94.

On July 27, 2000, Dr. Venkatesan saw Plaintiff for depression.  A social worker had informed Dr. Venkatesan that Plaintiff said he felt suicidal, but Plaintiff denied suicidal feelings.  Plaintiff was prescribed Prozac.  His blood pressure was noted as

---

[1]  One notation on the treatment notes from June 6, 2000, states that Plaintiff was seen for a problem with his left knee, but the notes seem to all involve his right knee.

145/110. Tr. at 91-92. On August 11, 2000, Plaintiff reported feeling "100% better" on Prozac and that his energy level was good. His right knee showed mild medial tenderness and some swelling, but tests for abnormalities in the knee were negative. Plaintiff was told to stop smoking and drinking alcohol. Tr. at 90. On August 17, 2000, it was noted that Plaintiff's hypertension was well-controlled by Norvasc, with a blood pressure reading that day of 100/72. Tr. at 89. On August 9, 2002, Dr. Venkatesan saw Plaintiff for a follow-up visit for hypertension. Plaintiff's blood pressure was 150/110. Plaintiff reported that he was smoking four to five cigarettes per day. His depressive symptoms were gone. Tr. at 87.

On June 26, 2003, Plaintiff was examined by Saul Silvermintz, M.D., for a physical consultation in connection with his current application for disability benefits. Plaintiff reported that he had been deaf in the right ear since birth and that his left ear was now worsening, but that he had no hearing aides and had done nothing about this problem. Plaintiff reported that he had carpal tunnel syndrome, but Dr. Silvermintz noted that he could not find out from Plaintiff the basis for this statement, other than Plaintiff's assertion that when he was a car mechanic, his hands would cramp when he was holding a tool. Plaintiff complained that his right knee had been bad for ten years and that it would give out on him, causing him to fall "many, many times." Plaintiff also complained that his left shoulder would pop out of place if he turned it the wrong way and that therefore, he could not lift anything using that arm. Plaintiff reported that he had been diagnosed with hypertension five to seven years ago, but that it was only a problem

when he got an infection and that he had been out of medication for hypertension for three years.  Plaintiff also claimed that he had pain in his right shoulder since his clavicle-repair surgery and that it still hurt if he lifted anything with his right arm.  Dr. Silvermintz noted that Plaintiff's memory was impaired such that Plaintiff could not recall dates or when he last saw a physician. Tr. at 115-16.

Dr. Silvermintz reported that Plaintiff was taking no medication and that Plaintiff said that he smoked one-half pack of cigarettes a day and had an occasional beer on the weekend, though there was a long history of alcohol abuse.  On examination, Plaintiff's blood pressure was 132/74.  Hearing tests showed loss of hearing in the right ear, with the ability to hear conversational tones with his left ear if that ear were directed towards the speaker.  Dr. Silvermintz noted that Plaintiff's left shoulder had a limited range of motion and that Plaintiff was afraid that abducting this shoulder past 90 degrees would make the shoulder pop out of place.  Dr. Silvermintz also noted that Plaintiff had a normal range of motion in his knees, but pain in the right knee on movement.  The doctor noted that Plaintiff walked with a limp favoring his left leg, could not walk on his toes, but could walk on his heels.  Dr. Silvermintz also noted that Plaintiff got on and off the examining table with no difficulty, that Plaintiff's extremities were without malformation, swelling, or edema, and that Plaintiff had "no trouble with fine finger movement of his hands."  Dr. Silvermintz evaluated Plaintiff's muscle strength as 5/5.  Dr. Silvermintz stated that no evidence of carpal tunnel syndrome was found, and that no hypertension was found that day, but that tachycardia (rapid heartbeat) was present, as well as a hearing impairment, a

history of alcohol abuse, moderate traumatic changes in the left shoulder, as shown by an x-ray taken that day, and mild degenerative disease in the right knee, also shown by an x-ray.  Tr. at 116-22.

On July 11, 2003, John Raabe, M.D., completed a Physical Residual Functional Capacity Assessment based upon his review of Plaintiff's file.  Dr. Raabe indicated that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently; could stand or walk for at least two hours and sit for about six hours of an eight hour day; had  a limited ability to push and pull with the upper extremities; and could climb, stoop, kneel, crouch, or crawl occasionally, and balance frequently.  Dr. Raabe noted deafness in the right ear and decreasing hearing ability in the left ear.  He also indicated that the record established limitations in the left shoulder and in the ability to reach in all directions, but no visual limitation, no manipulative limitation in handling and fingering, and no limitation with respect to exposure to extreme hot and cold, wetness, humidity, vibration, and fumes.  He noted that Plaintiff was to avoid concentrated exposure to noise and even moderate exposure to hazards such as machinery and heights.  Dr. Raabe opined that Plaintiff was only partially credible, as Plaintiff's allegations appeared to be out of proportion to the medical evidence of record.  Tr. at 126-33.

On July 17, 2003, Sherry Bassi, Ph.D., completed a Psychiatric Review Technique Form after reviewing Plaintiff's medical records.  She checked boxes indicating "no medically determinable impairment" and "insufficient evidence."  Tr. at 134.  On July 23, 2003, Plaintiff was seen for pain in the left knee due to falling from a bike, and for

follow-up on the right wrist. Hematocrit testing revealed anemia. Tr. at 195.

On April 10, 2004, Plaintiff presented to the emergency room with a dislocated left shoulder. Plaintiff reportedly had had an episode of syncope and had fallen off of his moped, which then fell on top of him. Salvador Lobianco, M.D., noted that Plaintiff was anemic and reported smoking a pack of cigarettes a day. Dr. Lobianco thought the syncopal episode reported by Plaintiff might be alcohol or anemia related, and suspected that Plaintiff drank more than the one beer per day that he reported, as indicated by his thrombocytopenia (low platelet count) and hypokalemia (low levels of potassium in the blood). Dr. Lobianco noted that Plaintiff was at risk for alcohol withdrawal. Tr. at 145-46. A transfusion was performed for Plaintiff's anemia. Tr. at 152.

Mark Belew, M.D., performed a closed reduction of Plaintiff's left shoulder under general anesthesia. Once the shoulder was repaired, it was placed in an immobilizer and Plaintiff was sent to recovery. Tr. at 144. The next day, April 11, 2004, Plaintiff refused a blood transfusion and was put on iron supplements. He was discharged on April 12, 2004, with a diagnosis of fracture dislocation of the left shoulder with recurrent dislocation, history of closed head trauma, thrombocytopenia, syncope, hypokalemia, and a history of alcoholic hepatitis. Dr. Belew wrote upon discharge that Plaintiff had had "a possible syncopal episode related to the heat and hydration with a possible heat stroke." Tr. at 152.

## Evidentiary Hearing of September 27, 2004

The ALJ first asked if Plaintiff could hear him, and after ascertaining that Plaintiff

could, the ALJ explained the order of the hearing. Plaintiff, who was represented by counsel, testified that he was 43 years old, had graduated from high school, and had last worked as a roofer for three days, after which he was fired for having poor equilibrium. His last job before that was working for Auto Zone in 1991 or 1992 as a parts specialist/technician and trainer. Plaintiff said that before that, he was an auto mechanic but had to stop because of his carpal tunnel syndrome. Upon prompting, he recalled that he had worked in landscaping, and also selling magnetic windows. Tr. at 241-44.

Plaintiff testified that he had been having trouble hearing for over ten years, and that it had worsened over the years. He said that on his right side, his hearing loss was so severe that he did not know if someone was talking to him unless he was looking at that person. He said that five years ago he had "some" hearing in his right ear. Plaintiff also said that his hearing in his left ear had worsened and if someone screamed at him, it hurt his left ear. He stated that this pain in his left ear had been going on for about six years. Plaintiff testified that he had never used a hearing aide, and had never spoken to a doctor about using one. He said that he was "searching other avenues" and that he was scared of doctors. Tr. at 244-46.

Plaintiff testified that he had two broken shoulders, a bad knee, and a problem going into his bathroom due to claustrophobia. He stated that he would not hesitate to go back to work if he could find a job. He said that his hearing loss, presumably in his right ear, was due to getting robbed in 1994. He testified that he had a plate in his right shoulder, which he had injured when he collapsed in April 2004 due to anemia, resulting

from his failure to eat properly. He said that he refused a blood transfusion at that point and instead went home and began taking vitamins. Tr. at 246-47.

Plaintiff testified that he could reach with his arms if he did so slowly, but if he stretched in a certain way, it felt like "the ball [of his shoulder] wants to pop out." He said that he had had surgery on his right shoulder, leaving him with five screws in that shoulder; and that "they had to put me out" to put his left shoulder back into place. He said that he could not lift anything due to the risk that his shoulders might "go out." When asked by the ALJ whether he had had further treatment for his shoulders such as physical therapy, Plaintiff stated that he had been borrowing money from people for years seeking any kind of treatment that might work, and that "right now I am looking at some medical research that might involve everything what was going on with my problems, but it doesn't have to do with taking pills, because I do not take pills." Plaintiff stated that he currently was not taking any pills, including vitamins, because he was afraid to do so, and that at one point he had taken pills that made his stomach bleed. Tr. at 247-49.

Plaintiff recounted that he injured his knee when he slipped on the polished floor at Auto Zone, that tests for fluid in the knee were inconclusive, and that "it just pops out." Plaintiff equivocated as to which knee was problematic, stating finally that his right knee was fine and that it was the left knee that would give way. He testified that a doctor once told him that he probably had a torn ligament, and that he had never had surgery on his knees. Tr. at 249-50.

Plaintiff stated that when he was able to, he cut the grass, did minor home

maintenance tasks such as plumbing and electrical work like changing a light bulb, and did tune-ups. He testified that he could do these tasks unless his hands cramped from his carpal tunnel syndrome, a condition which he had for over ten years. Plaintiff stated that he did not drive often because of his claustrophobia, which also made it difficult for him to be in small bathrooms and hallways. Tr. at 250-52.

Plaintiff testified that he was trying to volunteer at public elementary schools, and that he could teach the children law. He said that he was self-taught, and that although he was in poor physical condition and did not have the credentials, his mind was still there and he was "willing to do anything to support my family." Plaintiff also stated that he had a tall stack of bills that had accumulated since he could not find work. Tr. at 252-54.

When questioned by his attorney, Plaintiff testified that he had never been treated for a mental illness, had never been diagnosed with depression, but that he did have dyslexia. Plaintiff testified that he limped when his knee went out on him, which happened about every other day when he stepped the wrong way. Plaintiff said that he always had to watch the way he stepped, often grabbing the walls in his house, lest his knee go out. He stated that his right knee would "click" sometimes, and that it was that knee on which the exploratory testing was done. Plaintiff stated that he had not been to the doctor since he was hospitalized in April 2004, when he refused the blood transfusion and told the doctors he was not coming back. He testified that he did not have any problems with seizures ("None whatsoever"), but with eating enough food due to his bad teeth, and that this was the cause of his anemia and passing out. He also testified that

because of his problem with his right ear, he would lose his balance when he was walking, running into walls in his house, and had to grab things to avoid falling down. Plaintiff also said that he was losing his vision, but that he had glasses which he was not wearing at the time. He testified that he had problems sleeping because of his shoulders, and that he had gotten only approximately three hours of sleep per night for the past 15 years. Tr. at 254-60.

A vocational expert ("VE") testified that Plaintiff's past work was as an auto mechanic, a semi-skilled job requiring medium exertion; a landscaper, an unskilled job requiring heavy exertion; an auto parts salesman, a semi-skilled job usually requiring light exertion, but could require medium exertion; a stock clerk, an unskilled job requiring heavy exertion; and a window salesman, a semi-skilled job requiring light exertion. Tr. at 260-61.

The ALJ then posed several hypothetical questions to the VE, asking the VE to assume a person with the same vocational factors (same age, education, and work history) as Plaintiff. The ALJ first asked whether the hypothetical person could do any of Plaintiff's past work if the person could lift and carry 20 pounds occasionally and ten pounds frequently; could stand and walk for six hours and sit for six hours of eight; was limited to occasional stooping, crouching, crawling, kneeling, climbing, pushing and pulling with the upper extremities, and reaching overhead with both arms; could not hear in the right ear but could hear normal conversation in the left ear; and should not work at heights, around dangerous machinery, or automotive equipment. The VE responded that

such an individual could do Plaintiff's past work in automobile parts sales and window sales, as long as the individual could utter and understand conversational speech. Tr. at 261-62.

The ALJ then asked the VE whether an individual with the same limitations as the person in the first hypothetical, plus the added limitation of impaired hearing in the left ear so that the individual could not hear normal conversation, could perform the jobs in automobile parts sales or window sales. The VE replied that such an individual could not, but that such an individual could work as an assembler, file clerk, dining room or cafeteria helper, or janitor doing light work; and that there were respectively 20,000, 2,000, 5,000, and 15,000 such jobs in the St. Louis, Missouri, area. Tr. at 262-63.

The ALJ posed a third hypothetical question to the VE, asking the VE to assume an individual with the same limitations as in the second hypothetical, plus the limitations of lifting and carrying only ten pounds occasionally and less than ten pounds frequently, and standing or walking only two hours out of eight and sitting six hours out of eight. The ALJ asked if such an individual could work as an assembler, file clerk, dining room helper, or janitor, and the VE responded that the individual could not do those jobs, which were at the light exertional level. The VE testified, however, that such an individual could do sedentary[2] assembly jobs, and that there were 2,000 such jobs in the St. Louis

---

[2]    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20

area.  Tr. at 263.

Plaintiff's attorney then asked the VE to assume an individual with the added limitation of impaired equilibrium such that the individual fell and ran into walls daily. The VE stated that such an individual would be unable to perform any of the previously mentioned jobs.  Plaintiff's attorney asked how much reaching was required for a sedentary assembly job, and the VE responded that that work was usually done at a bench or table in front of the assembler.  The attorney asked if any sedentary assembly jobs could be performed if the individual needed to avoid significant industrial noise, and the VE said that five to ten percent of the sedentary assembly jobs would be eliminated.  The attorney made a brief closing statement, wherein he stated that he believed Plaintiff had "disequilibrium," requested a tilt table test, and left it to the ALJ to determine whether Plaintiff was mentally impaired to some degree, based on Plaintiff's testimony and history of closed head injury.  Tr. at 264-65.

**Post-hearing Evidence**

On October 11, 2004, Plaintiff went to the emergency room with complaints of a seizure that occurred while he was lying in bed watching TV.  Tr. at 199.  Plaintiff reported that he lost consciousness, shook all over, and bit his tongue; that he had been diagnosed with a seizure one year prior due to a head injury; and that he was not taking any medications.  Tr. at 204.  Plaintiff presented a prescription for Dilantin (a seizure

---

C.F.R. § 404.1567(a).

medication) dated June 2004, to the nurse on duty, and said he would like it to be filled. Tr. at 205.

On December 18, 2004, Riaz Naseer, M.D., examined Plaintiff as a consultant in connection with Plaintiff's application for disability benefits. Dr. Naseer noted that Plaintiff's chief complaint was a seizure disorder, reporting that he carried a diagnosis for such a disorder for ten years, since he was hit on the head by a thrown brick, and that he had recurrent seizures with the most recent about three months ago. Plaintiff said that when he had a seizure, he would feel hot and then would fall down. Plaintiff also said that he continued to have pain and discomfort in both shoulders. Dr. Naseer reported that Plaintiff had a history of hypertension and that Plaintiff was taking multiple medications, including Dilantin (100 mg three times a day), Acetaminophen, Flonase nasal spray, and vitamins. Tr. at 214-15.

Dr. Naseer observed that Plaintiff was awake, alert, and oriented, and that although Plaintiff was "rather slow" in responses, he was able to understand and carry on a conversation. But Dr. Naseer also noted that he often had to repeat questions, especially at the start of the interview when Plaintiff had "extreme difficulties in hearing." Plaintiff had some difficulty getting off the examination table, was able to ambulate unassisted, had some difficulty standing on his heels and toes, and was unable to perform tandem, even for two steps. Motor examination revealed normal strength in both upper and lower extremities, and upper extremity strength was rated as "good." Plaintiff had ataxia (loss of ability to coordinate muscles) and dysmetria (inability to judge range of motion) on

finger to nose to finger test with intention tremor (tremor that gets worse upon voluntary movement). Plaintiff's range of motion for both shoulders was described as "poor"; attached range-of-motion charts indicate flexion and abduction ranges of 130 out of 150 degrees for each shoulder. These charts also indicate a grip-strength of 5/5 on the left side, with no grip-strength level indicated for the right side. Tr. at 215-18.

In a Medical Source Statement of the Ability to Do Work-Related Activities (Physical), Dr. Naseer opined that Plaintiff could lift 25 pounds occasionally and ten pounds frequently; could stand, walk, sit, push, and pull without limitation; could never climb or balance; and could occasionally kneel, crouch, crawl, or stoop. Plaintiff was limited in his ability to reach in all directions, and in his ability to work near hazards such as machinery and heights. Tr. at 219-22.

## ALJ's Decision of January 28, 2005

The ALJ first found that there was no good cause to reopen a prior application for benefits that had been filed by Plaintiff in January 2000. The ALJ then found that the medical records confirmed that Plaintiff had hearing loss, hypertension, and alcohol abuse, but the hearing loss was only in Plaintiff's right ear, and the "very elevated blood pressure readings" that appeared in the record could have been related to Plaintiff's alcohol abuse. The ALJ recounted that when Plaintiff was examined on June 26, 2003, Plaintiff's blood pressure was normal and Plaintiff reported that he had not taken hypertension medication for three years. Tr. at 22-23.

The ALJ then reviewed the medical records. One of the things he noted was that

Dr. Silvermintz found no sign of carpal tunnel syndrome. The ALJ stated that there was some confusion regarding Plaintiff's shoulder injuries, as the right shoulder was injured in 1999, with no evidence to indicate that shoulder's status following surgery in 2000, and the left shoulder was injured in 2004, but in 2003, Dr. Silvermintz found no limitation to the right shoulder and moderate degenerative changes to the left shoulder. Tr. at 23-24.

The ALJ found that Plaintiff had moderate degenerative changes in his left shoulder, deafness in his right ear, cerebellar ataxia, and moderate degenerative changes in his right knee, which were "severe" impairments, as that term was defined in the Commissioner's regulations, but not impairments that met or medically equaled a deemed-disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 26. By implication, the ALJ did not believe that Plaintiff's hypertension and alleged carpal tunnel syndrome were severe.

The ALJ determined that Plaintiff had the following RFC: he could lift ten pounds "frequently and occasionally," could stand and walk for two or more hours in eight hours; could no more than occasionally push, pull, stoop, crouch, crawl, kneel, climb, or reach overhead bilaterally; could not hear on the left side but could hear normally on the right side;[3] and should avoid unprotected heights, dangerous machinery, and automotive equipment. The ALJ stated that he had considered Plaintiff's subjective complaints but

---

[3] The ALJ mistakenly stated here that Plaintiff could hear out of his right ear and could not hear out of his left ear, while the opposite was true. The ALJ correctly stated in another part of his opinion that Plaintiff could not hear with his right ear and could hear with his left ear, and in the hypothetical questions posed to the VE, the ALJ correctly described Plaintiff's hearing impairment. Tr. at 261.

did not find them sufficiently credible to support further limitations. The ALJ found that Plaintiff's allegations of total disability were inconsistent with his activities, and that there was no evidence that Plaintiff could not "perform daily household chores or maintain his own grooming." Tr. at 24. The ALJ also found that Plaintiff's allegations were internally inconsistent, as Plaintiff told Dr. Naseer that he had a ten-year history of seizures but there was no evidence of seizures prior to October 2004. The ALJ stated that although Plaintiff had had an episode of syncope in July 2003, there was no evidence that it was a seizure. The ALJ also noted that Plaintiff did not mention a seizure disorder at the hearing on September 27, 2004, and a seizure disorder was not confirmed by brain-imaging. The ALJ stated that this lack of consistency damaged Plaintiff's overall credibility. Tr. at 24.

Next, the ALJ accepted the testimony of the VE that Plaintiff could not perform any of his past relevant work. The ALJ recognized that the burden, therefore, shifted to the Commissioner to show that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. The ALJ noted that if Plaintiff could perform the full range of sedentary work, the Medical-Vocational Guidelines (found at 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1, Rule 201.28, would direct a finding of not disabled in light of Plaintiff's vocational factors and RFC. However, because Plaintiff could only perform "a significant range" of sedentary work and not the full range, a VE was needed to determine if jobs existed in the national economy that Plaintiff could do. The ALJ accepted the VE's testimony that Plaintiff could perform the

sedentary, unskilled job of assembler, and accordingly, found that Plaintiff was not disabled.  Tr. at 24-25.

**Additional Evidence before the Appeals Council and Appeals Council's Decision**

On December 20, 2004, Plaintiff completed a health assessment form in which he reported having a history of anemia, broken bones, carpal tunnel syndrome, seizures or convulsions, ear infections/hearing loss, eye problems/color blindness with glasses or contacts, head trauma/problems, high blood pressure, weight change, injury from car accidents, joint problems/injuries, numbness or weakness, past surgeries, and problems bending/lifting.  Tr. at 227.  Dr. A. Wright saw Plaintiff the same day, and diagnosed him with seizures likely due to past trauma or alcoholism, and advised him to continue taking Dilantin.  Tr. at 231.

On April 18, 2005, Plaintiff's attorney submitted a letter to the Appeals Council, noting that additional medical records dated February 7 to February 28, 2005, were attached.  Tr. at 233-36.  These records are not included in the record before the Court. On November 9, 2005, the Appeals Council denied review of the ALJ's decision of January 28, 2005.  The Appeals Council stated that it could not consider the additional medical records because they were dated after the ALJ issued his decision, and that if Plaintiff wanted the agency to consider whether he was disabled after January 28, 2005, he had to apply again.  Tr. at 6.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment

is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying vocational factors and degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE. <u>Baker v. Barnhart,</u>

457 F.3d 882, 894-95 (8th Cir. 2006).  Here the ALJ decided at step five that, based upon

the testimony of a VE, there were jobs in the economy that Plaintiff could perform.

## DISCUSSION

### ALJ's Determination of Plaintiff's RFC

As noted above, the ALJ determined that Plaintiff could lift ten pounds "frequently

and occasionally"; could stand and walk for two or more hours in eight hours; could no

more than occasionally push, pull, stoop, crouch, crawl, kneel, climb, or reach overhead

bilaterally; could hear normally with one ear; and had to avoid unprotected heights,

dangerous machinery, and automotive equipment.  Plaintiff argues that this determination

was unsupported by any medical evidence.  Plaintiff cites Lauer v. Apfel, 245 F.3d 700

(8th Cir. 2001), for the proposition that an ALJ's determination of a Plaintiff's RFC must

be supported by "some medical evidence."  Id. at 704.  This argument is without merit as

here the ALJ's determination of Plaintiff's RFC was supported by the opinions of Drs.

Silvermintz, Naseer, and Raabe.

As noted above, Dr. Silvermintz, who examined Plaintiff, observed that although

Plaintiff walked with a limp, he could get on and off the examination table without

difficulty and that both knees had full range of motion.  Although Dr. Silvermintz found

that Plaintiff's left shoulder had a limited range of motion, he rated Plaintiff's upper body

strength as a five on a scale of one to five.  Dr. Silvermintz did not find any evidence of

carpal tunnel syndrome, and wrote that Plaintiff's extremities were without malformation,

swelling, or edema.  Tr. at 116-20.  In sum, Dr. Silvermintz found no impairments that

would limit Plaintiff to a greater extent than reflected by the ALJ's RFC determination, which specified only occasional reaching overhead, and did not indicate an ability to lift.

Dr. Naseer, who examined Plaintiff on December 18, 2004, also offered findings that support the ALJ's RFC assessment. Dr. Naseer found that Plaintiff could frequently lift ten pounds; that Plaintiff's ability to stand, walk, push, and pull were unaffected; and that Plaintiff had full range of motion in both knees. Tr. at 216-22. One conflict does exist between Dr. Naseer's opinion and the ALJ's RFC determination. Dr. Naseer opined that Plaintiff could never climb, whereas the ALJ found that Plaintiff could climb occasionally. This discrepancy, however, is irrelevant, as the job the ALJ concluded Plaintiff could perform -- that of a sedentary assembler -- would presumably not require climbing.[4] The Court also notes that the RFC requirement that Plaintiff avoid unprotected heights, dangerous machinery, and automotive equipment would accommodate any syncopal disorder Plaintiff had, as well as Dr. Naseer's opinion that Plaintiff could not balance. As such, the Court concludes that the ALJ's RFC assessment is supported by substantial evidence in the record. Plaintiff presents no evidence suggesting that further inquiry by the ALJ into any matter would have yielded favorable evidence, and has, thus, failed to establish the prejudice necessary for a reversal due to the ALJ's alleged failure to develop the record. See Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006).

---

[4] Although the opinion of a doctor who did not examine a claimant does not constitute substantial evidence sufficient to override a treating doctor's opinion, the Court notes that Dr. Raabe opined, based upon his review of the medical record, that Plaintiff could occasionally climb. Tr. at 126.

**Plaintiff's Credibility**

Plaintiff next argues that the ALJ erred in finding that Plaintiff was not credible, because the ALJ did not consider the standard set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Polaski held that "the absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." Id. at 1322. Other factors that should be considered are the claimant's daily activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Id. An ALJ's failure to cite Polaski does not constitute error if the ALJ considers the relevant factors when making a credibility determination, and even when the ALJ does cite Polaski, the ALJ need not discuss each Polaski factor. Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Although an ALJ may not disregard a claimant's subjective complaints solely because they are not corroborated by objective medical evidence, the ALJ may properly discount medically unsupported accounts of symptoms if the record as a whole reveals inconsistencies. Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." Gonzales v. Barnhart, 465

24

F.3d 890, 895, (8th Cir. 2006); Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002) (holding that the ALJ was entitled to discount the credibility of plaintiff's subjective pain complaints because the plaintiff's testimony about her impaired functioning, as well as her prior behavior, did not correspond to the complaints recorded in her medical history).

Here, the Court finds somewhat problematic the ALJ's reliance on Plaintiff's testimony regarding his daily activities, in discounting the credibility of Plaintiff's allegations that he was disabled, as Plaintiff testified to rather limited activities. It does appear, however, that the ALJ's RFC assessment is consistent with the types of activities in which Plaintiff did engage. Moreover, the ALJ also relied on inherent inconsistencies in Plaintiff's own statements, particularly regarding Plaintiff's alleged seizure disorder. Although Plaintiff told Dr. Naseer that he had a ten-year history of seizures, the first mention of seizures in the medical record is the equivocal note from July 2003 that Plaintiff had "two episodes of syncope with possible seizures," possibly related to alcohol or anemia. Tr. at 145-46. Plaintiff also failed to mention a seizure disorder in his application for benefits or at the hearing on September 27, 2004. An ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (holding that a conflict between medical documentation and disability claimant's testimony regarding his consumption of alcohol was sufficient reason for the ALJ to discredit claimant's testimony); Zeiler v. Barnhart, 384 F.3d 932, 937 (8th Cir. 2004) (upholding ALJ's determination that claimant's subjective complaints were not credible when claimant's responses on a questionnaire

were inconsistent with her hearing testimony and her daily activities suggested that she was not completely disabled).

Although not mentioned by the ALJ, other inconsistencies in Plaintiff's statements are apparent in the record. Plaintiff's statements to various doctors about his alcohol consumption was inconsistent with medical documentation. He testified that he was never treated for depression, but the record indicates that he was. And he testified that he never takes pills, yet on October 24, 2004, he asked a nurse to fill a prescription for Dilantin. In sum, in light of the fact that "the credibility of a claimant's subjective testimony is primarily for the ALJ to decide, and not the courts," <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001), the Court concludes that the ALJ was justified in discrediting Plaintiff with regard to the extent of Plaintiff's impairments.[5]

## ALJ's Hypothetical Questions Posed to the VE

Plaintiff argues that the hypothetical questions posed to the VE were inadequate or not valid or incomplete because the ALJ's RFC determination was erroneous. A hypothetical question is proper when it includes all impairments that the ALJ accepted as true and excludes impairments that the ALJ properly discredited. <u>Pearsall</u>, 274 F.3d at 1220. The ALJ's third hypothetical even went somewhat beyond the ALJ's RFC determination, in that this question limited Plaintiff's ability to lift 10 pounds to

_____

[5] As noted by the Commissioner in her brief before the Court, the medical records contain several statements from different sources suggesting that Plaintiff is an alcoholic. Plaintiff, however, did not allege in his application for benefits that he was impaired by alcoholism, did not make such a claim at the evidentiary hearing, and does not so allege now. Thus, the Court finds no reversible error regarding this matter.

"occasionally" rather than "frequently and occasionally."  In light of the above conclusions, the Court further concludes that this hypothetical adequately represented Plaintiff's abilities.  The VE testified that an individual with the limitations contained in the third hypothetical, including the decreased ability to hear with the left ear and no ability to hear with the right ear, could not perform Plaintiff's past relevant work but could perform work that existed in the national economy.  Tr. at 261-63.  The Court concludes that the VE's answer to the third hypothetical constitutes substantial evidence for the ALJ to find that Plaintiff was not disabled.  "A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence."  Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).

## CONCLUSION

The ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 28th day of December, 2006